ROSE Z. KELLY *et al.*

*v.*

CARRIE KINSELLA *et al.*

*Filed at Ottawa May 12, 1896—Rehearing denied October 13, 1896.*

EVIDENCE—*force of the testimony of disinterested witness as against those having an interest.* The testimony of interested parties that no declaration of trust was executed by a grantee of land and that such grantee does not hold the property as security for money advanced, is insufficient to overcome the testimony of a witness who has no interest in the result of the litigation, supported by the other facts.

APPEAL from the Circuit Court of Cook county; the Hon. M. F. TULEY, Judge, presiding.

IRA W. & C. C. BUELL, for appellants.

L. M. ACKLEY, for appellees.

Mr. CHIEF JUSTICE CRAIG delivered the opinion of the court:

This was a bill in equity brought by Thomas Kinsella and Carrie Kinsella, against Rose Z. Kelly, Robert D. Kelly and Charles Z. Miller, to establish and enforce an alleged trust in favor of the complainant Carrie Kinsella, under which she claims title and the right of possession of lots 1 and 2, in O. A. Bogue's addition to Chicago.

It appears from the record that in January, 1892, and prior thereto, Carrie Kinsella owned the premises subject to certain encumbrances, consisting of judgment liens, mortgages and mortgage foreclosure sales, and that the property was then in the hands of a receiver under a trust deed, and the time of redemption under foreclosure sales would soon expire. At that time William T. Blair, an attorney in Chicago, was employed by the Kinsellas as their agent and attorney, to assist them in saving this property. Blair saw that the financial condition of the Kinsellas was such that it would be impossible to induce any person with money to make them a loan. He therefore determined to have them convey the property to some person in good standing and then make application for a loan. Hence, on the 8th day of January, 1892, he procured the execution of a deed from Carrie Kinsella and her husband, conveying the property to one Albert B. Clark, and at the same time Clark executed a declaration of trust to Carrie Kinsella, showing that he held the property in trust for her. This was not, however, recorded. The declaration of trust in substance provided that Clark should raise money to pay off the claims on the property, repay himself, and then reconvey to the Kinsellas. Blair testified that he consulted Charles Z. Miller, a real estate broker, who had previously made loans for him, and asked his assistance. He told him all about the complications in the title and how he proposed to straighten it. Miller inquired about location, value, rents, etc., and said he would want a large commission. Miller talked to Harrison Bros. about getting a $10,000 loan on the property. He introduced Blair to Robert D. Kelly, who occupied an adjoining office and was discounting city warrants. An arrangement was then made by which Kelly furnished Blair money to buy up outstanding judgments against the Kinsellas, in order to prevent judgment creditors from making redemption. Under this arrangement some $500 was furnished, Blair giving

his own notes and assigning judgments to Kelly which he procured against the Kinsellas to secure the payment of the money. Blair failed to pay his notes given to Kelly at maturity, and an arrangement was then made under which Rose Z. Kelly, wife of Robert D. Kelly, furnished $3220 with which to settle a suit brought by William Unkrey, involving a part of the premises, and to purchase three master's certificates of sale on the premises. After the purchase of the certificates of sale, deeds were taken out on them in the name of Rose Z. Kelly, and it is claimed on behalf of complainants in the bill, that upon receiving the deeds Rose Z. Kelly executed a declaration of trust, as follows:

"I, the undersigned, hereby agree and declare as follows:

"Whereas, by reason of the sale of the premises described as lots 1 and 2, O. A. Bogue's addition to Chicago, etc., under decree of foreclosure, there was this day due to Oswell A. Bogue $1680.91 upon the certificate of sale held by him; and whereas, by reason of two other sales of premises under a like decree, there was this day due to Josephine Unkrey $1039.65, upon two certificates held by her; and whereas, there was claimed by William Unkrey that he had some interest in premises, wherefore his suit was pending until this day, and on this day it is agreed, in behalf of Carrie Kinsella, that there was owing to William from former $500, and which the below mentioned Albert B. Clark consents to pay, and said suit has therefore been finally disposed of by payment of said sum; and whereas, there was also this day $488.10 due to Robert D. Kelly by reason of judgment liens on premises, or which were in danger of becoming such, and also $86.90 for services and advances by him made in behalf of Clark and for the use and benefit of premises, in all $575, and Kelly has likewise advanced a further sum of $200 in cash; and whereas, for the use, hire and interest of said moneys, including that hereinafter mentioned, for thirty days from this date, and for commissions to one Charles Z. Miller and for his services, is due and owing $300 to said Kelly and Miller, all were determined upon on an accounting had between the parties; and whereas, the money has this day been furnished by Kelly and Miller (in proportion unknown to me), sufficient to purchase all certificates of sale and pay William Unkrey $500, being in all $3220.56, and said certificates having been endorsed

over or are to be endorsed and delivered to me, so as to pass the legal title, and on the expiration of the period of redemption of the first it is designed and intended that I shall obtain a master's deed:

"Now, therefore, this is to evidence that I have no personal interest in said property, but am at all times to hold the same in trust for the purposes and parties aforesaid, and likewise any title I may acquire by reason of certificates of sale or matters aforesaid, for the use and benefit of Clark, provided, always, that Clark pay or cause to be paid to me or to Kelly or Miller, within thirty days after this date, without grace, all moneys advanced, to-wit, $4295.56.   *   *   *   Upon such payment being made in accordance with the provisions hereof, I covenant and agree to convey said land, and all property and interest herein referred to, unto said Albert B. Clark, by deed joined in by my husband, with covenants of warranty against my own acts.

"Witness my hand and seal, April 15, 1892.

ROSE Z. KELLY.   [Seal.]"

(Acknowledgment of foregoing agreement.)

The execution of this declaration of trust is denied by the Kellys and Miller. They claim that of the money they advanced to Blair, $500 was a loan to him personally; that they took the assignment of judgments as collateral security, and when Blair failed to pay the money he had borrowed when it became due, they purchased the certificates of purchase on the premises to protect themselves, understanding and believing that they were acquiring a good title to the premises. The declaration of trust was not produced on the hearing. Blair testified that about the middle of August or first of September, 1892, Miller called at his office, 187 Dearborn street, and got the paper from him and carried it away. Among other reasons Miller gave for wanting the paper was, that he did not have a copy; that the Kellys had a copy and he nothing to show for the $1000 he had put in, and ought to have it.

The facts and circumstances under which Miller procured the paper from Blair and carried it off are not fully and clearly explained by the testimony of Blair, but that

fact, of itself, is not, in our opinion, sufficient to over-
come the evidence in the record showing, or tending to
show, that the declaration of trust was executed. Blair,
who has no interest in the result of this litigation and
whose reputation for truth and veracity has not been
impeached, testified that the declaration of trust was
executed by Rose Z. Kelly and duly acknowledged be-
fore him as a notary public. A. B. Clark, who executed
the first declaration of trust, testified that while he held
the property he had made an application to obtain a loan;
that Blair came to him and said Miller could get more
money. He further testified "that arrangements had
been made between Mrs. Kinsella and Miller to put title
in Mrs. Kelly's name, in my place, and that they would
raise the money, and I told him that if Kinsellas, Miller
and the rest would agree I would be willing to sign a
quit-claim deed. Blair said he would bring me a decla-
ration making Mrs. Kelly take the same position I did.
*  *  *  He said Mrs. Kinsella was willing, and I then
told him if he would produce papers I would sign them.
He brought a paper similar to the declaration I signed.
I can't recollect what was in it—simply that she con-
sented to take my place." (Witness shown complainants'
Exhibit 2.) "I think it is the same document, because
here is the point I made particularly,—says that I am
not personally interested in the property, which I insisted
upon; that she was to take my place. There is a great
deal about amounts that Blair understood and I did not.
The paper he brought me was signed by Mrs. Kelly."
Renie Guth, a stenographer in the employ of Blair, tes-
tified that she wrote the Clark declaration of trust from
dictation by Blair, from her shorthand notes. She was
also shown a copy of the declaration of trust which pur-
ported to have been executed by Rose Z. Kelly, and tes-
tified that she wrote the original from Blair's dictation.
Moreover, the facts and circumstances surrounding the
transaction, in connection with the small amount of

money advanced by the Kellys and Miller in comparison with the real value of the property, all tend to establish the fact that the transaction was a loan, holding the property as security, and not a purchase. If Carrie Kinsella had sold her property to Mrs. Kelly, surely there would be some evidence of the price to be paid and the terms and conditions of the sale. But nothing of the kind is to be found in the record. No negotiation was ever shown to have existed between the parties pointing in the direction of a sale. No agreement to sell or purchase was established. There is much evidence in the record tending to prove that the property was worth $20,000, but no such sum was paid or agreed to be paid by Mrs. Kelly. The Kellys and Miller advanced, as we understand the evidence, $3700, of which $1500 was refunded at the time the loan of $8500 was procured on the property from Straus Bros., on the 8th day of August, 1892. According to their figures, if the transaction is to be regarded as a purchase, as claimed by appellants, Mrs. Kelly obtained property worth $20,000, subject to a mortgage of $8500, for $2200. It is unreasonable to believe that Mrs. Kinsella would sell property worth $20,000 for $10,700.

But it will serve no useful purpose to review the evidence in detail. It is true, Miller and the Kellys deny that Mrs. Kelly executed the declaration of trust, and deny that Mrs. Kelly holds the property as security for money advanced; but they are all interested in the result of the litigation, and we do not think that their testimony should be held sufficient to overcome the testimony of Blair,—a witness who has no interest whatever in the result of the litigation,—supported as his testimony is by other facts and circumstances in the record.

In view of all the testimony we think the decree of the circuit court was authorized by the evidence, and it will be affirmed.

*Decree affirmed.*